IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Bradley A. Myhre,                                       (Chapter 7)

      Debtor.                                      Case No. 12-14088

---

Bradley A. Myhre,

      Plaintiff

v.                                             Adv. No. 12-169

U.S. Department of Education,

      Defendant.

---

## MEMORANDUM DECISION

The U.S. Department of Education (the "DOE") resists the discharge of a student loan debt owed by a quadriplegic debtor. Bradley A. Myhre filed a Chapter 7 petition and scheduled a debt of $14,072 owed to the DOE, and later filed a complaint seeking its dischargeability. Unsurprisingly, repayment of this loan would impose an undue hardship on Mr. Myhre, and under § 523(a)(8) of the Bankruptcy Code, the debt is therefore dischargeable. 11 U.S.C. § 523(a)(8).

In 1994, Mr. Myhre slipped on a swimming pool ladder and broke his neck. He survived but suffered a C5-C6 spinal cord injury. The accident left him paralyzed from the chest down. He has limited use of his shoulders and arms, little wrist extension, and no use of his fingers or hands. He requires an electric wheelchair to get around and assistance with all his daily needs, including eating, dressing, and bathing. He cannot even hold a spoon without specialized equipment. Due to these limitations, he needs a full-time, live-in caregiver.

1

Before the accident, Mr. Myhre worked as a laborer making hardwood trim. After the accident, he depended on government assistance in the form of Social Security disability payments of approximately $884 per month. In 2000, he decided to attend college and try to find a job that he could perform despite his physical limitations. He enrolled at Western Technical College and completed an associate's degree in computer programming. After five years of applying for jobs with no success, he decided to return to school for a bachelor's degree. He enrolled in an online program through Franklin University, using the student loan funds at issue in this case. In 2010, while he was still in school, he was hired by his current employer, Workforce Connections. He finished the semester for which he received the loan funds but did not complete the degree because the physical strain of his job left him unable to continue his coursework.

Mr. Myhre works as a database administrator and website developer. In order to bring him on board, Workforce Connections made several expenditures to accommodate his disability. Mr. Myhre requires a specialized desk that is big enough for his wheelchair to fit under, modified software to allow him to use the mouse pointer and translate his speech into text, a larger monitor, and wide enough doors for him to get into the office and use the elevator. The job currently requires his presence at two locations: La Crosse, which is 52 miles from his home, and Viroqua, which is 15 miles from his home. He depends on his caregiver to drive him to and from work in his specially fitted van.

Mr. Myhre testified that it was difficult for him to find employment due to his disability. His disability involves both extra costs and risks for an employer. Any employer would have to invest in making the workplace accessible, as Workforce Connections has done. Additionally, Mr. Myhre is susceptible to pressure sores. He testified that, "[s]itting up in a sitting position I cannot move to do pressure relief, so there's always pressure on my butt. If I don't do a pressure relief or

get off, I can get skin breakdown, which can lead to spending six to twelve weeks on my back in bed in the hospital." This has happened to him in the past. It is recommended that he spend no more than six to eight hours sitting without lying down to relieve the pressure.

Mr. Myhre received Social Security disability payments until his job situation became stable. He relied on the payments throughout school and during the seven month trial period for his job. Since then, Mr. Myhre has attempted to support himself on his earnings. Mr. Myhre is working full time and earning between $29,000 and $35,000 per year (he earned $35,000 in 2011; then in 2012, due to staff cut-backs, he was down to 32 hours per week and only took home $29,000; and this year he expects to make $35,000 again). Mr. Myhre's loan with the DOE came due six months after his final classes at Franklin University. At that time, he put the loan in deferment. He looked into the income-based repayment plan but would have been unable to afford the monthly payment and therefore continued to defer the loan.

With the increased costs of living as a quadriplegic, Mr. Myhre's monthly income does not cover the monthly expenses for a basic standard of living. He has relied on credit cards and the generosity of his caregiver to make ends meet each month. Out of Mr. Myhre's $3,526 monthly budget for basic expenses, his caregiver covers $1,423 out of her own pocket. Mr. Myhre's monthly income is $2,015, and with the help of credit cards, he has been paying $2,103 each month. The burden of this situation led both Mr. Myhre and his caregiver to declare bankruptcy in 2012.

The DOE argues that it would not impose an undue hardship on Mr. Myhre to repay his student loan because he is working full time. They do not suggest that he has any funds available beyond those necessary for his daily living expenses, so it is hard to guess how they believe his working full time allows for additional payments. The DOE also argues that Mr. Myhre has not

3

made good faith efforts to repay the debt because he was quadriplegic at the time that he took out the loans; he has not enrolled in an income-based repayment plan; and he failed to remit to the DOE any of the inheritance that he received on the death of his father in 2011. Given Mr. Myhre's circumstances, these arguments are not persuasive.

Under § 523 of the Bankruptcy Code, student loan debt may be discharged where it would impose an "undue hardship" on the debtor to repay the loan:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> . . .
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>> (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>>
>> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
>> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual . . .

11 U.S.C. § 523(a)(8). In *In re Roberson*, the Seventh Circuit Court of Appeals adopted the "*Brunner* test" for undue hardship. *See In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (citing *Brunner v. N.Y. State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir. 1987)). Under the *Brunner* test,

> "[u]ndue hardship" requires a three-part showing (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Roberson*, 999 F.2d at 1135. For many years, the test set an incredibly high bar for undue hardship in the Seventh Circuit: "Although a minority of courts have adopted a 'gentler' test for undue

4

hardship, the Seventh Circuit follows a strict and narrow interpretation of the formula set forth in *Brunner* . . ." *In re Nelsen*, 404 B.R. 892, 894 (Bankr. E.D. Wis. 2009).

In *Roberson*, the Court of Appeals stated that the first prong of the *Brunner* test "requires an examination of the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary." *Roberson*, 999 F.2d at 1135. The second prong "properly recognizes the potential continuing benefit of an education, and imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period." *Id.* The third prong requires good faith efforts to make repayment "as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Roberson*, 999 F.2d at 1136. Finally, the Court of Appeals further clarified that "undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Id.* The court summed up the three criteria as "certainty of hopelessness." *Id.*

In a recent decision, the Court of Appeals injected common sense into its consideration of § 523(a)(8). *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882 (7th Cir. 2013). The court recognized *Brunner* but declined to require that the certainty of hopelessness and the proof of prior payment overwhelm the inquiry into the future burden of the debt in question to the debtor's anticipated livelihood. In *Krieger*, the debtor was 53 years old, living with her mother in a rural community, and had been unable to find employment as a paralegal in the 11 years since receiving paralegal training. Under the *Brunner* test, there was no dispute 1) the debtor could not maintain a minimal standard of living if forced to repay the loans, and the court determined 2) the debtor's state of affairs was likely to persist and 3) she had made a good faith effort to repay the loans. The court determined that the debtor's circumstances were likely to

5

persist despite the creditor's arguments that the debtor should accept jobs that pay less than a paralegal position. The debtor had searched as diligently as she could for work, given her circumstances – the scarcity of paralegal jobs in the rural community, her lack of Internet, and an old vehicle in need of repairs. Additionally, due to the debtor's age, the fact that she had not held a job since 1986 when she left the workforce to raise a family, and that she did not earn more than $12,000 per year when she was employed, the court determined it was "not the sort of background employers are looking for." *Krieger*, 713 F.3d at 884. The court also determined that the debtor had a made a good faith effort to repay the loans even though she did not enlist in an income-based repayment program. *Id.* The program would have stretched out her repayment period to 25 years, allowed her to pay little to nothing while her income was low, and forgiven any remaining balance at the end of the 25 years. *Id.* at 883-84. The court determined that such a program only indicated a commitment to future efforts to repay, and that such a commitment was not required. If it were, "no educational loan could *ever* be discharged, because it is always possible to pay in the future should prospects improve." *Id.* at 884. The debtor's good faith effort to repay was demonstrated by her decade-long job search and her decision to devote a substantial part of her divorce settlement to payment on the loan. *Id.* at 883. In its decision, the court noted that certainty of hopelessness "sounds more restrictive than the statutory 'undue hardship,'" *id.* at 885, and stated that "[i]t is important not to allow judicial glosses, such as the language in *Roberson* and *Brunner,* to supersede the statute itself." *Id.* at 884.

*Krieger* provides a refreshing reevaluation of the standard for undue hardship. When the *Brunner* test was originally developed, it only applied to a small subsection of student loans. *See* Shanna M. Kaminski, *Do Changes in the Bankruptcy Code and the Educational Borrowing*

*Environment Warrant Abandoning the* Brunner *Test?*, 2013 No. 5 Norton Bankr. L. Adviser NL2 (May 2013). As the Bankruptcy Code has changed, and the amount of student loan debt has continued to rise, narrow interpretations of the *Brunner* test have become increasingly restrictive. Prior to 1978, student loans were not excepted from discharge at all. *Id.* Due to concerns that recent college graduates were abusing student loans (and presumably reducing the availability of student loan funds for deserving future students) by borrowing to receive an education and then filing for bankruptcy shortly after graduation, the 1978 Bankruptcy Code included a provision excepting from discharge any student loan made by a governmental unit or nonprofit institution of higher education that had come due within five years of the bankruptcy filing, unless repayment of the loan would pose an undue hardship. *Id.* (citing Pub. L. No. 95-598, § 523, 92 Stat. 2549, 2591 (1978), codified at 11 U.S.C. § 523(a)(8); Peter B. Barlow, *Nondischargeability of Educational Debts Under Section 523(a)(8) of the Bankruptcy Code: Equitable Treatment of Cosigners and Guarantors?*, 11 Bankr. Dev. J. 481, 488 (1994-1995)). All other student loans were still dischargeable. This was the state of student loan dischargeability when *Brunner* was decided in 1987. Shortly thereafter, Congress amended § 523(a)(8) to lengthen to seven years the time period that had to lapse before a student loan was automatically discharged. *Id.* (citing Crime Control Act of 1990, Pub. L. No. 101-647, § 3621, 104 Stat. 4789, 4964-64 (1990)). Eight years later, Congress eliminated the provision that made student loans automatically dischargeable, leaving "undue hardship" as the only way to discharge student loans. *Id.* (citing Higher Education Amendments of 1998, Pub. L. No. 105-244, § 971(a), 112 Stat. 1581, 1837 (1998)). In 2005, Congress amended § 523(a)(8) to except private student loans from discharge as well. *Id.* (citing Bankruptcy Abuse and Consumer Protection Act, Pub. L. No. 109-8, § 220, 119 Stat. 23, 59 (2005)).

Combined with this expansion of nondischargeability for student loans has been a steady rise in educational borrowing. In 1987, at the time of the *Brunner* decision, educational debt was approximately $42 billion in the U.S. *Id.* (citing *Heavy Burden of College Debt Raises Anxiety for Young Families' Future*, available at http://www.nytimes.com/1987/01/29/ us/ heavy-burden-of-college-debt-raises-anxiety-for-young-families-future.html). Twenty-five years later, there is nearly $1 trillion in outstanding educational debt. *Id.* (citing *In re Roth 2013 WL 1623839*, at *10 (Pappas, J., concurring) (citing Donghoon Lee, Federal Reserve Bank of New York, *Household Debt and Credit: Student Debt* (Feb. 28, 2013), available at http://newyorkfed.org/newsevents/mediaadvisory/2013/Lee022813.pdf). The average student loan balance is almost $25,000 and about 17% of borrowers are more than 90 days past due on their loans. *Id.* (citing Lee, *Household Debt and Credit*). The vast majority of this student loan debt is due to private lenders that made loans for considerable fees and profits with lax scrutiny of repayment probabilities because their risks have been curtailed by government guaranties.

Mr. Myhre is an articulate and personable young man, whose mobility is determined by his wheelchair and dexterity is only sufficient to operate a directional stick control. His daily life requires bravery and tenacity. It would impose an undue hardship on him to repay the student loan at issue. He cannot pay the minimal expenses of his personal maintenance and employment. Mr. Myhre has made a truly admirable effort to return to work in order to support himself financially rather than remain reliant on government aid. However, even with full-time employment, with the increased costs of living for a quadriplegic, Mr. Myhre has been unable to make ends meet. As it is stated in *Krieger*, Mr. Myhre satisfies all three prongs of the undue hardship test. Under the first prong, Mr. Myhre cannot maintain a minimal standard of living if required to repay the loan. Even without making payments on the loan, Mr. Myhre is unable to

break even each month. Most of Mr. Myhre's monthly expenses are unarguably necessary for a basic standard of living, and his medical expenses comprise a high percentage of those. The DOE cited "cable" as a line item expense that was not necessary, but for someone with Mr. Myhre's condition, there are few options for low cost entertainment, and cable access for TV and Internet is necessary for a minimal standard of living. There are few other discretionary expenses in his budget. Furthermore, Mr. Myhre cannot even afford these expenses as it is. Out of Mr. Myhre's $3,526 monthly budget for basic expenses, his caregiver covers $1,423 out of her own pocket.

This state of affairs is likely to persist due to Mr. Myhre's disability. It took Mr. Myhre over five years to secure his current position with Workforce Connections, and he can only look forward to a 2% annual raise with this company. It would be futile to seek alternative employment. As he explained in his testimony, to hire him, an employer is faced with the increased costs of making the workplace handicap accessible and the risks associated with the possibility that he could get pressure sores. While Mr. Myhre has not made any payments toward his student loan, he has still made a good faith effort to repay. He got himself off of Social Security Disability. Despite his disability, he is working full-time. He has never had a positive monthly cash flow in order to have funds available to pay towards his student loans.

The DOE argued that some significance should attach to the fact the loan was sought after Mr. Myhre had become quadriplegic. But, when questioned as to what that significance was, none was identified. Mr. Myhre made no attempt to disguise his disability from the lender in his application nor could he have done so if there had been a personal meeting. The DOE chose to make the loan when it did. To suggest now that the there was some defect in its inception misstates the standard for dischargeability under § 523(a)(8). It seems disingenuous

to argue that Mr. Myhre lacked good faith to repay because he was quadriplegic at the time he took out the loans. He likely was more optimistic about his employment prospects after returning to school.

The DOE also argues that Mr. Myhre should have enrolled in an income-based repayment plan. Mr. Myhre investigated his repayment options but would not have been able to afford even a modest payment under an income-based repayment plan, and instead put his loan in deferment. Like in *Krieger*, the failure to enroll in an income-based repayment plan does not show a lack of good faith because Mr. Myhre has not had available funds to contribute to any plan.

Finally, the DOE argues that Mr. Myhre should have paid some of the inheritance he received from his father in 2011 toward the loan. Mr. Myhre spent the $30,000 digging a new well, building a garage to protect the conversion on his handicapped vehicle, and weatherizing his house. These were basic, prudent expenditures that Mr. Myhre was wise to prioritize, providing for a basic level of well-being, and therefore do not indicate a lack of good faith. Mr. Myhre has done his best to earn an income that would allow him to financially support himself, and it is not his fault that even working full-time, he is unable to make ends meet. By putting his loan in deferment, he indicated a willingness to work within the repayment framework and pay if funds became available.

Mr. Myhre has overcome tremendous odds to find full-time employment in an attempt to financially support himself. He earned a degree in computer programming, sits through a long commute each day, and faces the risk of pressure sores from daily life at a desk. Due to the high cost of living as a quadriplegic, Mr. Myhre is still unable to make ends meet each month. Therefore, it would impose an undue hardship on Mr. Myhre to be forced to repay his student

loan to the DOE. Under § 523(a)(8), the debt is therefore dischargeable in bankruptcy. It may be so ordered.

Dated: July 25, 2013

*[signature]*

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE